UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.        )<br>)<br>JEREMY FRANCISCO PINALES- )<br>DIAZ      ) | No. 2:20-cr-00003-JAW-2 |

**ORDER ON MOTION TO SUPPRESS**

Appraising all the circumstances surrounding a defendant's custodial interview, the Court concludes that the government sustained its burden to prove that it is more likely than not that the defendant's statements to law enforcement were the result of a knowing and voluntary waiver of known rights and were not the result of intimidation, coercion, or deception, and the Court denies the defendant's motion to suppress evidence from the interview.

**I.    BACKGROUND**

On December 6, 2019, the Government initiated a criminal complaint against Jeremy Francisco Pinales-Diaz, charging him with conspiring with others on or near November 26, 2019, to defraud by the use of unauthorized access devices in violation of 18 U.S.C. § 1029(a)(2). *Crim. Compl.* (ECF No. 1). On January 9, 2020, a federal grand jury indicted Mr. Pinales-Diaz on the same charge. *Indictment* (ECF No. 15). On April 13, 2020, Mr. Pinales-Diaz filed a motion to suppress "any and all statements made by him to law enforcement . . . ."[1] *Mot. to Suppress Evid.* at 1 (ECF

---

[1]    Although Mr. Pinales-Diaz makes this request and, in his motion, Mr. Pinales-Diaz refers to incriminating statements that he made during the initial arrest, his motion is not directed to those statements. Rather, his motion is directed to the later interview by Secret Service Agent Tyler Martin.

No. 62) (*Def.'s Mot.*). The Government responded on May 4, 2020. *Gov't's Opp'n to Def.'s Mot. to Suppress* (ECF No. 65) (*Gov't's Opp'n*).

## II.   THE PARTIES' POSITIONS

### A.   Jeremy Francisco Pinales-Diaz's Motion

Mr. Pinales-Diaz seeks to suppress the statements he made about this federal charge to Secret Service Agent Tyler Martin on January 15, 2020, after Mr. Pinales-Diaz was placed under arrest for the federal charge at the town of Auburn, Maine, Police Department. *Def.'s Mot.* at 2-4. Mr. Pinales-Diaz contends that when considering all the circumstances, including (1) that he was under arrest, (2) that he was held in handcuffs the entire time, (3) that he was in the interview room for one-hour and forty minutes before being questioned, (4) that he was young, (5) that he was born in the Dominican Republic and came to the United States when he was fourteen years old, (6) that he had no prior experience with the criminal justice system, (7) that he was in police custody, and (8) that he was offered leniency in exchange for his cooperation with the investigation. *Id.* at 1, 3-4.

### B.   The Government's Response

In response the Government provides the Court with a video of Mr. Pinales-Diaz's entire time in the interview room and a transcript of the interview with Secret Service Agent Martin. *Gov't's Opp'n*, Attach. 1, *Video—Filed in Hand* (*Video*); *Gov't's Opp'n*, Attach. 2, *Tr. of Video* (*Interview Tr.*). The Government stresses slightly different aspects of the January 15, 2020, interview: (1) that the door to the interview

---

The Court does not address statements Mr. Pinales-Diaz made to law enforcement during his initial arrest.

room was open the entire time he was waiting, (2) that Mr. Pinales-Diaz could see the co-defendant Gilbert Reyes sitting in the hallway while the door was open, (3) that initially, Mr. Pinales-Diaz was handcuffed with his hands behind his back, (4) that while he was waiting, he asked to go to the bathroom and an officer escorted him to the bathroom, (5) that during and after that bathroom break, Mr. Pinales-Diaz was handcuffed so that his hands were in front of him, (6) that after one hour and forty minutes, Agent Martin arrived and his interview of Mr. Pinales-Diaz lasted about thirty minutes, (7) that Agent Martin conducted the entire interview although an Auburn police officer was present at different times,[2] (8) that at the outset of the interview, Agent Martin asked Mr. Pinales-Diaz whether he was comfortable speaking English and Mr. Pinales-Diaz said that he was, (9) that Agent Martin gave Mr. Pinales-Diaz a complete description of his *Miranda*[3] rights, (10) that Mr. Pinales-Diaz said that he understood his rights and agreed to speak with Agent Martin, (11) that Agent Martin informed Mr. Pinales-Diaz that lying to a federal agent was a separate crime for which he could be prosecuted, (12) that Agent Martin encouraged Mr. Pinales-Diaz to not answer a question rather than lie, (13) that at least twice during the interview, Mr. Pinales-Diaz chose not to answer specific questions from Agent Martin, (14) that Agent Martin told Mr. Pinales-Diaz that he would answer Mr. Pinales-Diaz's questions even if Mr. Pinales-Diaz did not answer his questions, and (15) that Mr. Pinales-Diaz asked Agent Martin several questions, all of which

---

[2] Detective Nick Gagnon, the Auburn police officer, asked Mr. Pinales-Diaz one question at the end of the interview. *See Interview Tr.* at 13.
[3] *Miranda v. Arizona*, 384 U.S. 486 (1966).

Agent Martin answered. *Id.* at 1-2. The Government contends that taking into account all the circumstances, Mr. Pinales-Diaz's statements were knowing and voluntary and not the result of coercion. *Id.* at 3-6.

### III. LEGAL STANDARDS

The law applicable to a defendant's statements while in custody is well-developed. "<u>Miranda</u> and its progeny require that law enforcement officers provide warnings concerning certain Fifth Amendment rights—including the right to remain silent and the right to consult an attorney—before interrogating a suspect in a custodial setting." *United States v. Carpentino*, 948 F.3d 10, 20 (1st Cir. 2020) (citing *United States v. Hughes*, 640 F.3d 428, 434 (1st Cir. 2011); *United States v. Conley*, 156 F.3d 78, 82 (1st Cir. 1998)). "Absent such warnings, most statements that officers obtain during a custodial interrogation are inadmissible at trial." *Id.* (citing *Conley*, 156 F.3d at 82). "Once a suspect is advised of his <u>Miranda</u> rights, though, he may waive those rights and consent to an interrogation." *Id.* (citing *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)).

Even after a suspect has been informed of his *Miranda* rights and has spoken with law enforcement, courts "must ask whether, appraised in light of all the circumstances, the waiver was both knowing and voluntary." *Id.* at 26 (citing *United States v. Bezanson-Perkins*, 390 F.3d 34, 39-40 (1st Cir. 2004)). The First Circuit cautioned that an "inquiring court must start with the presumption that the suspect did not waive his rights, and the government bears the burden of showing the validity

4

of the waiver by a preponderance of the evidence." *Id.* (citing *United States v. Downs-Moses*, 329 F.3d 253, 267 (1st Cir. 2003)).

## IV.   DISCUSSION

The First Circuit emphasized that a court must evaluate "all the circumstances" in determining whether the Government sustained its burden to demonstrate that a suspect's waiver was knowing and voluntary. In his motion, Mr. Pinales-Diaz focuses on certain aspects of his waiver and so the Court directly assesses those specific issues and ends with a more general analysis of the waiver. It does, however, address several of the factors presented by the facts in this case.

A major factor relied upon by Mr. Pinales-Diaz is that Agent Martin urged him to tell the truth and promised him leniency if he did so. *See Def.'s Mot.* at 3. In *Carpentino*, the law enforcement officers repeatedly urged the defendant to "tell the truth and cooperate," but the First Circuit was not convinced that these statements coerced the defendant in that case into making a confession. 948 F.3d at 28. The First Circuit observed that "[n]either an admonition to tell the truth (even if repeated) nor a suggestion that cooperation would lead to favorable treatment is enough, without more, to constitute impermissible coercion." *Id.* (citing *United States v. Jacques*, 744 F.3d 804, 809-810 (1st Cir. 2014); *Bezanson-Perkins*, 390 F.3d at 42-43).

Here, after introducing himself as a federal agent, Agent Martin told Mr. Pinales-Diaz that "the big difference between the federal government and state and local government is cooperation actually helps you." *Interview Tr.* at 3. Agent Martin explained to Mr. Pinales-Diaz:

5

> You get points, it's all a point system. So if you admit your wrong you accept responsibility for what you did, you cooperate with the investigation, all those things like that, that assists you further on down. Not necessarily with me or the charges right but as far as sentencing and dealing with prosecution, do you understand what I've said so far?

*Id.* Mr. Pinales-Diaz responded, "Yes sir." *Id.* Later, Agent Martin told Mr. Pinales-Diaz that lying when "speaking to a federal agent regarding a criminal case" is "a separate charge" and suggested he not answer a question rather than lie. *Id.* at 5-6.

The Court finds that these law enforcement statements are relatively mild and non-coercive and fall well within First Circuit guidance. In fact, as the *Carpentino* Court noted, the arresting officer in that case actually threatened that if the suspect did not cooperate, he would "do everything in [his] power to see that [the defendant] went back to jail for as long as possible." 948 F.3d at 28. Here, by contrast, Agent Martin only mentioned the possibility Mr. Pinales-Diaz could benefit from cooperation and did not threaten him with penalties if he failed or refused to do so. The Court does not view his statement that lying to a federal agent is a separate crime as a threat, especially since Agent Martin gave Mr. Pinales-Diaz an option— not answering a particular question—that would allow him to avoid answering a question without making him susceptible to additional criminal charges.

Mr. Pinales-Diaz also points to the fact he was kept in handcuffs in a room for one hour and forty minutes before Agent Martin arrived and began questioning. *Def.'s Mot.* at 3-4. Again, *Carpentino* is illuminating. In *Carpentino*, the First Circuit addressed a six-hour gap between the first part of an interview and the second part. 948 F.3d at 28 ("[T]he defendant focuses on the lack of food and sleep and the six

6

hours that passed before he signed the second waiver form"). The First Circuit observed that "[n]or does the six-hour duration of the detention, in and of itself, invalidate the defendant's waiver." *Id.* The *Carpentino* Court went on to state that "[c]ourts generally find involuntariness based on the length of a suspect's detention or interrogation only when that factor is 'accompanied . . . by other facts indicating coercion, such as an incapacitated or sedated suspect, sleep and food deprivation, and threats.'" *Id.* at 28-29 (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010)). Here, Mr. Pinales-Diaz waited for one hour and forty minutes while handcuffed in an interview room with the door open, but there is no evidence that he was weakened by incapacity or sedation or was subjected to other coercive acts, such as sleep or food deprivation or threats. Applying First Circuit authority, the Court does not find that the delay in interviewing Mr. Pinales-Diaz rendered his waiver involuntary.

In *Jacques*, the First Circuit listed other factors that a court could consider in determining whether the government had met its burden of proof. The *Jacques* Court stated that

> [r]elevant considerations include the length and nature of the questioning, promises or threats made by investigators, and any deprivation of the suspect's essential needs. They also include the defendant's personal circumstances, including his age, education, intelligence, and mental condition, as well as his prior experience with the criminal justice system. A defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary.

744 F.3d at 809 (internal citations omitted).

Although the record reveals some factors that weigh in favor of finding that Mr. Pinales-Diaz's statements were not voluntary, such as his age and his lack of

7

prior involvement with the criminal justice system, other factors weigh heavily in favor of a conclusion that he knowingly and voluntarily waived his Fifth Amendment right to remain silent. Turning first to the factors that support the view that his statements were involuntary, the Court accepts the representations in Mr. Pinales-Diaz's motion that he had learned earlier that day that the state charges had been dismissed and federal charges were being initiated against him and that when he arrived at the Auburn Police Department, he was placed under arrest; therefore, Mr. Pinales-Diaz was clearly in police custody at the time of the interview. *Def.'s Mot.* at 1-2. The video begins with Mr. Pinales-Diaz in the interview room, seated in a chair, with his hands handcuffed behind his back. *Video.*

The Court also accepts the representations in Mr. Pinales-Diaz's motion that he was twenty-two years old at the time of the interview, that he was born in the Dominican Republic, that he came to the United States when he was fourteen years old, and that he is a United States citizen. *Def.'s Mot.* at 1. The assertion in his motion that he had never previously been arrested is consistent with the interview and the Court accepts the broader statement in the motion. *Id.*; *Interview Tr.* at 2 (Agent Martin: "Have you ever dealt with a federal agent before?" Jeremy Pinales-Diaz: "Uhh, never in my life"). The interview also suggests that Mr. Pinales-Diaz had not consulted a lawyer before he made these statements to Agent Martin because he asked Agent Martin two questions about the legal process. *See Interview Tr.* at 12-13. These factors, along with his long wait alone while handcuffed in the interview room, all suggest that his statements to Agent Martin could have been involuntary.

8

But these factors are overborn by circumstances that strongly demonstrate that Mr. Pinales-Diaz's statements to Agent Martin were the result of a knowing and voluntary waiver. First, Mr. Pinales-Diaz was twenty-three years old;[4] he had not just become an adult. Second, although he was alone in an interview room for an extended period before the interview began, the door to the interview room was open and when he asked for a bathroom break, he was escorted to the bathroom and his hands were thereafter handcuffed in front of him. Third, although he was born and brought up the first fourteen years of his life in the Dominican Republic, he is a United States citizen and he said he was comfortable if the interview was conducted in English. *See id.* at 3. Fourth, Agent Martin orally gave him the *Miranda* warnings in a straightforward and direct fashion and Mr. Pinales-Diaz indicated no uncertainty or hesitation about his right to remain silent, his right to counsel, or any other right. He affirmatively stated that he understood each right and then stated that he was willing to speak with Agent Martin. *Id.* at 4-5. The Government bears the burden of proving compliance with *Miranda, see United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), and based on the record before it, the Court finds the Government has sustained its burden in this case.

Fifth, having viewed the video, the Court finds that Agent Martin's demeanor throughout the interview was calm and respectful. Indeed, at the end of the interview, the following interchange took place: Agent Martin: "Thanks, Jeremy."

---

[4] Mr. Pinales-Diaz says in his motion that he was twenty-two at the time of the initial arrest. *Def.'s Mot.* at 1. The Government says that he was twenty-three at the time of the interview. *Gov't's Opp'n* at 5. The Court assumes that both statements are true.

9

Jeremy Pinales-Diaz: "You're welcome." *Interview Tr.* at 16. From its review of the video, Agent Martin never raised his voice, badgered Mr. Pinales-Diaz, or attempted to coerce statements from Mr. Pinales-Diaz. Sixth, similarly, Mr. Pinales-Diaz was calm, logical, and coherent throughout his interview. Seventh, the interview itself lasted only about a half hour and Mr. Pinales-Diaz began making statements early in the interview. This was not an extended, exhausting session where the officer wore down a suspect's resistance over time. *See United States v. LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004) (en banc) ("We place substantial weight on the fact that [the defendant] confessed after a mere thirty-three minutes. Thus, this is not a situation where the officers wore down a defendant's will with persistent questioning over a considerable length of time").

Eighth, one of the most telling aspects of interview was the fact that Mr. Pinales-Diaz was selective in what he told Agent Martin and what he would not tell him. From the Court's perspective, the line was between what he had done and what others had done. Mr. Pinales-Diaz was willing to discuss his own involvement but unwilling to talk about others who were involved in the conspiracy:

> **[Agent Martin (SATM]:** Who gave you the information? Like how did you get it? Cause again we've seen the surveillance footage right. You walk in you have data how did how did who sent you the data?
>
> **[Jeremy Pinales-Diaz (JPD)]:** Umm, I don't want to answer.
>
> **SATM:** Okay, that's fine . . ..

*Interview Tr.* at 6. The Court notes that not only did Mr. Pinales-Diaz decline to answer the question about who else was involved, but also Agent Martin accepted his

10

decision and did not press him to answer. Mr. Pinales-Diaz maintained this limit to his cooperation throughout the interview: he was willing to talk about himself but not others:

> **SATM:** Who would pay you?
>
> **JPD:** Uh, no.
>
> **SATM:** You don't know.
>
> **JPD:** It was given to me.
>
> **SATM:** Who, Who?
>
> **JPD:** I don't want to say.
>
> **SATM:** Okay . . ..

*Id.* at 7. Mr. Pinales-Diaz later acknowledged some involvement of others, but his statements generally confirmed what he knew law enforcement already knew from the surveillance tapes and investigation. From the Court's perspective, Mr. Pinales-Diaz's decision to answer some, but not all, questions is a hallmark of voluntariness. If Mr. Pinales-Diaz knew he did not have to answer some questions, the Court finds that he also knew, as he was told, that he did not have to answer any questions.

Ninth, this finding is reinforced by the fact that later in the interview, Agent Martin told Mr. Pinales-Diaz that he would answer his questions even if Mr. Pinales-Diaz declined to answer the Agent's questions:

> **SATM:** . . . I'm gonna ask you a few more questions and then you can ask me your questions alright. Even if and I'll answer your questions even if you don't answer mine. Fair enough?
>
> **JPD:** [IA]

11

> **SATM:** Okay. I don't want you to feel like you have to answer my questions otherwise I won't answer your questions.

*Id.* at 8.

Tenth, there is no claim and no evidence that Agent Martin used any form of chicanery or deception during the interview. *See Jacques*, 744 F.3d at 812 ("Extreme forms of deception or chicanery by the police may be sufficient to render a confession involuntary").

On balance, taking into consideration all the circumstances, the Court concludes that the Government sustained its burden to demonstrate that it is more likely than not that Jeremy Francisco Pinales-Diaz's statements to Agent Tyler Martin on January 15, 2020, were the result of his knowing and voluntary waiver of his rights and not the result of intimidation, coercion, or deception.

## V. CONCLUSION

The Court DENIES Jeremy Francisco Pinales-Diaz's Motion to Suppress Evidence (ECF No. 62).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 24th day of July, 2020